STATE EX REL. FORT HOWARD PAPER COMPANY, Petitioner-Appellant, v. STATE OF WISCONSIN LAKE DISTRICT BOARD OF REVIEW, Defendant-Respondent.

*No. 77–042. Argued January 5, 1978.—Decided March 7, 1978.*
(Also reported in 263 N.W.2d 178.)

494

For the petitioner-appellant there was a brief by *Michael R. Wherry, Jerry A. Edgar* and *Mulcahy & Wherry, S. C.* of Milwaukee, and oral argument by *Michael R. Wherry.*

For the respondent the cause was argued by *John J. Glinski,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J. This is an appeal from a judgment dismissing a writ of certiorari and affirming the decision of the State of Wisconsin Lake District Board of Review (hereafter board). The board set the petitioner-appellant, Fort Howard Paper Company's (hereafter petitioner) 1975 real property improvement valuation at $27,000,000. The petitioner contends that the valuation was erroneous because the board failed to consider excess operating costs and certain market adjustments in arriving at its appraisal of valuation. The petitioner also contends that sec. 70.995(7)(b), Stats. (1975) and the board's valuation contravened the uniformity of taxation and equal protection clauses of the Wisconsin Constitution and the equal protection clause of the United States Constitution. The petitioner's constitutional arguments are based on allegations that the 1975 valuation resulted in the petitioner paying a disproportionate amount of real property taxes in the city of Green Bay and in the Northeast Vocational, Technical and Adult Education District.

The issues are as follows:

I. In reviewing the evaluation of the petitioner's manufacturing property, did the board act beyond its jurisdiction because there was insufficient evidence to provide any substantial basis for the board's decision?

(a) Did the board erroneously fail to consider the petitioner's excess operating costs?

(b) Did the board erroneously fail to consider market adjustments to five of the petitioner's buildings?

II. Did the petitioner prove that the 1975 valuation of its manufacturing property caused the petitioner to bear a disproportionate amount of the Green Bay or Lake District property tax in violation of the uniformity of taxation clause of the Wisconsin Constitution?

III. Does sec. 70.995(7) (b), Stats. (1975) contravene the equal protection provisions of the Wisconsin or United States Constitution because it allows for a phased in reassessment of all Wisconsin manufacturing property over a period of four years?

*Applicable Statute.*

Sec. 70.995, Stats. provides in pertinent part as follows:

"70.995. *State Assessment Of Manufacturing Property* . . . . (7) . . . (b) In making the May 1, 1974, manufacturing property assessment of any city, village or town, the department of revenue shall equalize the assessment of all manufacturing property within each city, village or town. Thereafter, the department of revenue shall revalue each year as many taxation districts as the available staff will permit so as to bring and maintain each property assessment within such taxation district at full value pursuant to ss. 70.32(1) and 70.34. The department of revenue shall proceed with such work so as to complete and maintain the reevaluation of all manufacturing property in the state every 4 years. . . ."

On August 2, 1975 the petitioner received its 1975 assessment for real property improvements located in the City of Green Bay. The amount of the assessment for the seventy buildings in question was $30,500,000. The structures had a book value in May 1975 of $15,669,235, and an actual cost of $23,694,688. The buildings are located on approximately 100 acres of land, and comprise a paper mill having a production output of 800 tons per day. The same improvements had been assessed by the

Wisconsin Department of Revenue at $18,183,874 in 1974, the year in which the department took over the state-wide assessment of all manufacturing property from local assessors pursuant to sec. 70.995, Stats. (1975).

The net increase (after subtracting $1,900,000 for new construction during 1975) exceeded $10,000,000. The 1975 assessment represented a fifty-seven percent increase for the same improvements over the preceding year's assessment.

Before the State of Wisconsin took over manufacturing property assessments in 1974, the local assessor for the City of Green Bay had conducted all of the annual property tax assessments within the city. He had made onsite inspections of the petitioner's property in 1969, 1971, 1972 and 1973 for the purpose of making annual property tax assessments.

The petitioner's property is located in the Wisconsin Department of Revenue's Lake District that covers seventeen counties located in the north central and northeastern sections of the State. This district includes Brown County. In 1974 only a few reassessments of manufacturing property were made in the Lake District to establish the initial values for new construction. Onsite appraisals of manufacturing property began in 1975. Within that district, in 1975, only manufacturing property in Brown and Winnebago Counties were onsite inspected.

Fifteen to sixteen percent of the total Lake District manufacturing property was onsite inspected in 1975. The remaining eighty-four to eighty-five percent was maintained at 1974 assessed values with additions made for new construction during the preceding year for "economic increases" reflective of the increase in basic construction costs from 1974 to 1975. Something in excess of fifty percent of the non-inspected manufacturing property received economic increases ranging from

zero to fifteen percent, with the norm being seven and one-half percent. Much of the non-inspected manufacturing property received no economic increases.

Petitioner's property was inspected in March of 1975 by Thomas Smith and two other Department of Revenue employees. They conducted their inspection of the buildings on March 6, and 7, 1975. The inspection process for appraisal of the seventy buildings took between five and one-half and seven hours.[1]

In July of 1975, American Appraisal Company was retained by the petitioner to make an appraisal of the petitioner's improvements for property tax purposes. The inspection of the buildings began in late July. One appraiser worked three weeks, and another two weeks, on the onsite portion of the appraisal. In its final appraisal report American Appraisal determined the fair market value of the improvements to be $22,026,000. This valuation was slightly higher than the $20,893,000 fair market value relied upon by the petitioner in proceedings both before the board and on this appeal. The difference between the lower value reached by petitioner and that of American Appraisal resulted from a variance in the respective calculations of the amount of "excess operating costs" attributable to the taxable property.

"Excess operating costs" are an element of functional obsolescence used as a deduction factor in arriving at the fair market value of manufacturing property. The costs are a determination of the additional manning, operating and maintenance costs that are annually required to operate a plant that is inefficiently laid out as compared to an ideal modern plant of the same capacity. The total excess annual operating costs are capitalized over the remaining economic life of the buildings and reduced to

[1] Initially, only sixty-five buildings were appraised by the state inspectors. Mr. Smith conceded that his assessment omitted five buildings valued at over $1,000,000.

a present value pursuant to a formula, after consideration of the company's excess manpower, equipment and plant overhead.

Mr. Smith testified before the board that his initial appraisal included a twenty-five percent reduction for functional obsolescence, including excess operating costs.

After the petitioner's objection to the valuation was filed with the Lake District Board of Review, the State Board of Assessors requested the Wausau office of the Department of Revenue to review the assessment of the petitioner's premises, primarily to analyze functional obsolescence. Myron Duginski, a Department of Revenue appraiser, inspected the facility on September 25 and 26, 1975, and reviewed the Lake District's assessment which had been prepared by Thomas Smith. Mr. Duginski's conclusions noted,

"The following clerical errors . . .

"(1) The local modifier applied to the basic replacement cost was the same for all buildings.

"(2) Some of the original structures one of which is presently being rebuilt, has been given a remaining residual life incompatible with field observations.

"(3) Basic cost and depreciation were improperly applied in one instance.

"(4) Five buildings were omitted.

"(5) New construction was duplicated.

"(6) Functional depreciation does not appear appropriate as no basis is given for the percentage applied."

After making his independent determination of excess operating costs, Mr. Duginski testified that his excess operating cost penalty totaled $6,338,394 as compared to American Appraisal's figure of $5,492,500 for the main mill and outlying buildings. Mr. Duginski also testified that acquiring data pertaining to the company's excess hourly manning, equipment and operating costs would result in a more accurate total for functional obsolescence.

During the original onsite inspection in March of 1975, the State appraisers did not make any written analysis of excess operating costs, nor did they request any of the supporting data from Fort Howard, such as wage rates or manpower schedules.

Mr. Duginski testified before the board that his appraisal of the petitioner's improvements was $26,400,000. This figure included the deduction of $6,338,394 for excess operating costs.

The State Board of Assessors in reviewing the revised assessment rejected many of the changes made by Mr. Duginski, but corrected the local modifiers, included valuation of omitted property and corrected the errors concerning new construction. The net result of the additions and deductions made by the State Board of Assessors was to reduce the assessment for the improvements from $30,500,000 to $29,500,000.

The determination of the State Board of Assessors was appealed to the Lake District Board of Review and after a lengthy hearing the board rendered its decision in letters of June 22, 1976 and August 16, 1976. The board reduced the assessment for petitioner's improvements from $29,500,000 to $27,000,000. This decrease resulted from a five percent reduction in the state's current replacement cost estimate of $55,962,899 and a slight increase in the physical depreciation deduction.

On October 28, 1976, petitioner sought certiorari review of the board's decision in the circuit court for Brown County. In a written decision, the Honorable Robert J. Parins affirmed the board's $27,000,000 valuation and directed entry of a judgment dismissing the writ of certiorari.

### Excess Operating Costs.

The petitioner challenges the accuracy of the board's valuation of its improvements. Where a trial court or

this court reviews the actions of a board of review, the following standards apply:

(1) Boards of review are quasi-judicial and courts have no jurisdiction to disturb their determinations except where they act in bad faith or exceed their jurisdiction.

(2) A board's valuation of property will be upheld if there is any substantial basis for its decision.

(3) The presumptions are all in favor of the rightful action of the board. The assessor's valuation of properties is prima facie correct and is binding upon the board in the absence of evidence showing it to be incorrect. *State ex rel. Mitchell Aero v. Bd. of Review,* 74 Wis.2d 268, 280, 281, 246 N.W.2d 521 (1976) and cases cited therein.

There were four appraisals of the petitioner's improvements. The petitioner claimed that its improvements were worth $20,893,000. American Appraisal valued the property at $22,026,000. Mr. Smith, an experienced Department of Revenue industrial appraiser, valued sixty-five of the petitioner's seventy buildings at $30,500,000. Myron Duginski, who the petitioner states had a great deal of industrial and papermill appraisal experience, testified that $22,000,000 was not a realistic appraisal of the petitioner's property. Mr. Duginski appraised the petitioner's property at $26,400,000. Mr. Smith's $30,-500,000 figure was reduced by the State Board of Assessors and further reduced by the board of review. $27,-000,000 was the figure ultimately arrived at by the board.

The petitioner disputes the accuracy of the $27,000,000 valuation despite the fact that the valuation is well within the range of appraisals testified to by the various experts before the board of review. Specifically, the petitioner contends that the board failed to properly consider deductions for excess operating costs caused by the inefficient layout of the petitioner's buildings and production

process. The board had before it three excess operating cost studies: (1) The American Appraisal Company study showing a deduction of $5,492,500, (2) The combined American Appraisal and Fort Howard study reflecting excess operating costs of $6,625,500; and (3) Department of Revenue appraiser Duginski's independent study supporting a deduction of $6,338,394. Mr. Smith's appraisal, most of which was retained by the board included an across the board twenty-five percent deduction for all functional obsolescence including excess operating costs.

The petitioner strenuously argues that no excess operating costs were deducted by the board because the board rejected the concept of excess operating costs and because there was no evidence that Mr. Smith made any detailed analysis of such costs when making his appraisal. In a letter to petitioner, the secretary of the board made comments about excess operating costs that demonstrated that the board may have rejected the concept of excess operating costs. Nonetheless, the board's final valuation did make a deduction for excess operating costs. Mr. Smith's original appraisal allowed a twenty-five percent deduction for all functional depreciation including excess operating costs. That deduction appears on the summary of Mr. Smith's appraisal. The State Board of Assessors made certain corrections in Mr. Smith's appraisal but made no change in his twenty-five percent figure for functional obsolescence. The board of review further reduced Mr. Smith's appraisal, but again the record shows that the board retained the twenty-five percent figure in making their final appraisal.

■

The only remaining question is whether the twenty-five percent figure included an accurate estimate for excess operating costs. The petitioner contends that Mr. Smith could not have accurately determined excess

operating costs because he made no detailed analysis of such costs. This question involves the credibility of an expert witness, and such credibility is a question for the factfinder. *Lemberger v. Koehring Co.*, 63 Wis.2d 210, 217, 216 N.W.2d 542 (1974) ; *Soper v. Industrial Comm.*, 5 Wis.2d 570, 574, 93 N.W.2d 329 (1958).

The factfinder is also charged with the responsibility of determining whether the facts underpinning an expert opinion are true. *Breunig v. American Family Ins. Co.*, 45 Wis.2d 536, 545, 173 N.W.2d 619 (1970). *Rollie Johnson Plumbing v. Dept. of Transp.*, 70 Wis.2d 787, 235 N.W.2d 528 (1975).

". . . opinions of experts . . . have some probative value even though such opinions are not based upon technical or academic knowledge, but upon expertise gained from experience." *Luke v. Northwestern Nat. Cas. Co.*, 31 Wis.2d 530, 535, 143 N.W.2d 482 (1966).

Once it is determined that an expert's testimony has probative value, the question of the sufficiency and weight of the expert evidence are for the factfinder to determine. *Luke, supra.* Mr. Smith testified as follows before the board:

"Mr. Smith: . . . as I went through the plant I looked at the plant, looked at the functions in the layout and design of that plant and saw where it was inadequate and by my experience in going through the plant by looking at actually what was there I arrived at a twenty-five percent functional depreciation which included all of these items which are evident and which are a part of and caused by the plant layout and design.
"Mr. Chairman: In other words you are saying you allowed ten million dollars for functional obsolescence.
"Approximately that's correct. This is the amount that I feel the plant has suffered because of the functional obsolescence including all forms of functional obsolescence."

Based on this record, a twenty-five percent deduction was made in the appraisal for all forms of functional obsolescence. Mr. Smith testified that such figure included excess operating costs. If the board had not taken any excess operating costs into consideration, their decision would have been erroneous. But here, despite the board's misgivings about the concept of excess operating costs, the record shows that such costs were deducted.[2]

The petitioner contends that the board erroneously, and without any evidentiary basis, deleted special market adjustments in the valuations of five of the petitioner's buildings. It is jurisdictional error for a board of review to ignore uncontradicted and unimpeached evidence in reaching its decision. *State ex rel. I.B.M. Corp. v. Board of Review,* 231 Wis. 303, 306, 385 N.W. 784 (1939); *Rosen v. Milwaukee,* 72 Wis.2d 653, 662, 242 N.W.2d 681 (1976). As was stated in *State ex rel. Heller v. Lawler,* 103 Wis. 460, 465, 79 N.W. 777 (1899):

"For, where the evidence is undisputed and there is no proof whatever to sustain the decision of the board, they cannot arbitrarily and capriciously place a value upon the real estate different from that placed upon it by the witnesses. . . . They have no more legal power to decide against all the testimony in respect to the value of property, than a court has to decide against all the evidence produced before it."

In this case the board disregarded the market adjustments that were not disputed in any phase of the proceedings. The board claims that Mr. Smith's twenty-five percent functional obsolescence estimate included the separate market adjustments for the five buildings. This

[2] It is also noteworthy that Mr. Duginski's appraisal of $26,400,000 was close to the board's figure of $27,000,000 despite the fact that Mr. Duginski made one of the highest estimates of excess operating costs of any of the appraisers.

argument is contradicted by the summary of Mr. Smith's appraisal. That summary shows that Mr. Smith made the five market adjustments in addition to his twenty-five percent deduction. There was no evidentiary basis for the board's deleting the undisputed market adjustments and they should have appeared in the board's final appraisal. For this reason the assessment must be set aside and the case remanded for the board to correct its assessment to include the market adjustments of the five buildings in question.

## *Uniform Taxation.*

The petitioner contends that the re-evaluation of its improvements pursuant to sec. 70.995(7)(b) violated the uniformity of taxation clause, Art. VIII, sec. 1 of the Wisconsin Constitution.[3]

There are a number of presumptions and maxims favoring the constitutionality of a statute. All statutes are presumed constitutional and will be held to be so unless proven otherwise beyond a reasonable doubt by the party attacking the statute. The cardinal rule of statutory construction is to preserve a statute and find it constitutional if it is at all possible to do so. This court is not concerned with the political, economic or social wisdom of the act under consideration. Our only duty is to determine whether the statute clearly contravenes some constitutional provision. *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis.2d 32, 46, 47, 205 N.W.2d 784 (1973)

---

[3] "ARTICLE VIII. *Finance. Rule Of Taxation Uniform; Income, Privilege And Occupation Taxes.* Section 1. The rule of taxation shall be uniform . . . Taxes shall be levied upon such property . . . as the legislature shall prescribe. Taxation of agricultural land and undeveloped land, both as defined by law, need not be uniform with the taxation of each other nor with the taxation of other real property . . . ."

and *A.B.C. Auto Sales, Inc. v. Marcus,* 255 Wis. 325, 330, 331, 38 N.W.2d 709 (1949).

For a tax to be constitutionally uniform it must meet the following standards:

"1. For direct taxation of property, under the uniformity rule there can be but one constitutional class.

"2. All within that class must be taxed on a basis of equality so far as practicable and all property taxed must bear its burden equally on an ad valorem basis.

"3. All property not included in that class must be absolutely exempt from property taxation.

"4. Privilege taxes are not direct taxes on property and are not subject to the uniformity rule.

"5. While there can be no classification of property for different rules or rates of property taxation, the legislature can classify as between property that is to be taxed and that which is to be wholly exempt, and the test of such classification is reasonableness.

"6. There can be variations in the mechanics of property assessment or tax imposition so long as the resulting taxation shall be borne with as nearly as practicable equality on an ad valorem basis with other taxable property." *Gottlieb v. Milwaukee,* 33 Wis.2d 408, 424, 147 N.W.2d 633 (1967).

In its memorandum decision the trial court found that the petitioner's improvements were valued non-uniformly as compared to Green Bay residential property because the petitioner's valuation rose while that of Green Bay residents did not. But, the trial court reasoned that such non-uniformity was constitutionally permissible because there was uniform treatment within the class of industrial property. Residential and industrial property could be treated differently because they ". . . would not fall in the same class."[4] This interpretation contradicts

---

[4] The trial court also found some inequality between the revalued appraisal of the petitioner's improvements and those of other manufacturers within the Department of Revenue's Lake District.

the first standard set forth in *Gottlieb, supra* and violates the uniformity clause.

Real and personal property cannot be assessed at different ratios of full value. *State ex rel. Baker Mfg. Co. v. Evansville,* 261 Wis. 599, 609, 53 N.W.2d 795 (1952). Until the Constitution was amended in 1974,[5] agricultural land could not be assessed at a lower percentage of fair market value than residential property. *State ex rel. Boostrom v. Board of Review,* 42 Wis.2d 149, 160, 166 N.W.2d 184 (1969). In *Gottlieb, supra,* this court stated that,

". . . uniform treatment within a class did not satisfy the uniformity clause, and that there could be but one class of property for tax purposes, and when 'once the true value is arrived at, each dollar's worth of one sort of property is liable for exactly the same tax as a dollar's worth of any other sort of property. . . .' "[6]

The trial court's uniformity analysis was incorrect, but the trial court's error does not prove that the valuation of petitioner's property under sec. 70.955(7)(b), Stats. (1975), was unconstitutional. Before the petitioner can begin to carry its heavy burden of proving unconstitutionality, it must first prove that a number of

The trial court sanctioned this different treatment on the ground that, ". . . the state legislature has wide latitude to select subjects of taxation and to grant exemptions." This reasoning was a misapplication of the doctrine of legislative exemption. All property within a constitutional class must be taxed uniformly. The legislature may exempt property from taxation but then that class must be absolutely exempt. *Gottlieb, supra.*

[5] Art. VIII, sec. 1, Wisconsin Constitution, *supra,* footnote 3.

[6] All of the uniformity cases cited above involved assessment rates and this petitioner complains of non-uniform valuation. This difference is unimportant because Art. VIII, sec. 1, requires both uniform rates and uniform valuations. *Knowlton v. Supervisors of Rock County,* 9 Wis. 410, 421 (1859).

508

valuations were incorrect. For 1975, the petitioner must prove that its improvements were overvalued and that Green Bay residents or other Lake District manufacturers were undervalued.

The assessor's valuation is prima facie correct in the absence of evidence to the contrary. *State ex rel. Boostrom v. Board of Review, supra* at 42 Wis.2d 155. The burden of proving that an assessor's valuation is incorrect is on the party attacking it. *State ex rel. Evansville Merc. Asso. v. Evansville,* 1 Wis.2d 40, 42, 82 N.W.2d 899 (1957).

The petitioner contends that it was non-uniformly evaluated in 1975 because in that year its valuation increased fifty-seven percent while Green Bay residential property did not increase in value at all. The petitioner argues that because the 1974 valuation was presumed to uniformly distribute the Green Bay tax burden and because that presumption has not been rebutted, the 1975 valuation must have resulted in a non-uniform valuation.

This argument can be used to support the opposite conclusion with equal persuasiveness. The 1975 valuations are presumed correct. In addition, the petitioner's 1975 valuation was supported by expert testimony before the board of review (see discussion of excess operating costs above). There is no evidence to dispute the uniformity of the 1975 valuations. Therefore, it could be argued that the 1974 valuation was erroneous. The petitioner has fallen far short of proving beyond a reasonable doubt that sec. 70.955(7) (b), Stats. (1975) caused a non-uniform valuation of its property in 1975.[7]

---

[7] In its memorandum decision, the trial court found that in 1975 the petitioner's improvements were non-uniformly valued, *vis a vis* Green Bay residential property. This finding is not supported by anything other that the presumption of correctness referred to above.

The petitioner next contends that its improvements were non-uniformly valued as compared to other manufacturers in the Department of Revenue Lake District. In 1975, fifteen to sixteen percent of Lake District manufacturers were onsite inspected, including the petitioner. One-half of the remaining eighty-four to eighty-five percent of manufacturers received economic increases of zero to fifteen percent to reflect the increased cost of land and improvements. The other half of the eighty-four to eighty-five percent had no increase in their valuations.[8]

The supervisor of assessments in the Lake District testified that fifteen to sixteen percent more of the district's manufacturers would be revalued in 1976. He hoped to have all revaluations done in four years, but it could take as long as six years because of personnel limitations.

Petitioner's other evidence of non-uniform taxation *vis-a-vis* Lake District manufacturers was an exhibit that compared the increase to petitioner's and other onsite inspected paper companies in the Lake District with Lake District paper companies that were not onsite inspected. Onsite inspected companies had their valuations raised an average of 20.2%. Paper companies that were not onsite inspected had an average increase of 3.37%.

The petitioner has again failed to carry its heavy burden of showing that in 1975 its improvements were unconstitutionally overvalued as compared to other Lake District manufacturers. If the petitioner's 1975 valuation was correct, as was concluded above, then the peti-

[8] The petitioner contends that increasing the valuation of any of the manufacturers that were not onsite inspected violates sec. 70.32, Stats. (1975) requiring that property be assessed ". . . at full value which could ordinarily be obtained therefor at private sale . . ." Petitioner lacks standing to raise this argument. Petitioner's valuation was not raised by economic increases, but following an onsite inspection.

tioner must show that other Lake District manufacturers were under-valued in 1975. There is no such evidence in the record.

In regard to both Green Bay residential property and Lake District manufacturing property, the petitioner claims that because its property increased in value and the other property did not, the later valuation of petitioner's property was incorrect. If petitioner's 1975 valuation was correct then an equally likely inference is that the petitioner's valuation increased dramatically in 1975 because petitioner was under-valued prior to 1975.

The petitioner also contends that the four year cyclical revaluation plan outlined in sec. 70.995(7)(b), Stats. (1975) is a violation of the uniformity of taxation clause.[9] Only a person whose rights have been affected may question the constitutionality of a statute. *Milwaukee v. Milwaukee Amusement, Inc.,* 22 Wis.2d 240, 251, 125 N.W.2d 625 (1964) ; *Butala v. State,* 71 Wis.2d 569, 578, 239 N.W.2d 32 (1976). We hold that the petitioner has failed to show that the 1975 revaluation of its property resulted in a non-uniform valuation. Because the petitioner has failed to show that the revaluation plan has violated its constitutional rights we need not further consider the constitutionality of cyclical revaluation plans.

### Equal Protection.

The petitioner contends that the phased-in four year reassessment of Wisconsin industrial property pursuant to

---

[9] We note that such cyclical revaluation plans have been declared constitutional in a number of other jurisdictions. Annot. (1961). 76 A.L.R.2d 1077. We express no opinion as to whether such a plan, on its face, contravenes the uniformity clause of the Wisconsin Constitution.

sec. 70.995(7)(b), Stats. (1975) offends equal protection.[10]

The requirements of equal protection in taxation are much different than those of the uniform taxation provision just discussed. In *Puget Sound Co. v. King Co.*, 264 U.S. 22, 44 S. Ct. 261, 68 L. Ed. 541 (1923), the court ruled that taxing the property of a street railway differently than that of commercial steam railway did not offend equal protection. The court stated that,

"The reports of this Court are full of cases which demonstrate that the Fourteenth Amendment was not intended, and is not to be construed, as having any such object as these stiff and unyielding requirements of equality in state constitutions. . . .

"The provisions in the Fourteenth Amendment, that no State shall deny to any person within its jurisdiction the equal protection of the laws, was not intended to prevent a State from adjusting its system of taxation in all proper and reasonable ways. It may, if it chooses, exempt certain classes of property for any taxation at all, such as churches, libraries and the property of charitable institutions. It may impose different specific taxes upon different trades and professions, and may vary the rates of excise upon various products; it may tax real estate and personal property in a different manner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness, or not allow them. All such regulations, and those of like character, so long as they proceed within reasonable limits and general usage, are within the discretion of the State legislature, or of the people of the State in framing their Constitution . . ." *Puget Sound*, at 264 U.S. 28.

[10] The petitioner is claiming a denial of equal protection under both state and federal constitutions. The standards are similar because ". . . Art. I, Sec. 1 of the Wisconsin Constitution is substantially equivalent to the due process and equal protection clauses of the fourteenth amendment to the United States Constitution." *State ex rel. Sonneborn v. Sylvester*, 26 Wis.2d 43, 49, 132 N.W.2d 249 (1965). *State ex rel. Cresci v. H. & S. S. Dept.*, 62 Wis.2d 400, 414, 215 N.W.2d 361 (1974).

State governments have wide discretion in tax and fiscal affairs but,

"The state must proceed upon a rational basis and may not resort to a classification that is palpably arbitrary. The rule is often stated . . . that the classification must rest upon some ground of difference having a fair and substantial relationship to the object of the legislation." *Allied Stores Of Ohio, Inc. v. Bowers Ohio,* 358 U.S. 522, 527, 79 S. Ct. 437, 3 L. Ed.2d 480 (1959).

This court has also stated that the legislature may make distinctions on a proper economic or political basis, but an enactment violates equal protection if,

". . . the classification does not rest upon a difference between the classes which bears a fair, substantial, natural and just relation to the objective of the act." *Harris v. Kelley,* 70 Wis.2d 242, 251, 234 N.W.2d 628 (1975).

In *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 353 38 S. Ct. 495, 62 L. Ed. 1154 (1918), the mining company complained that it was denied equal protection because its property was assessed at full value and other property in the township was assessed at one-third of full value. This occurred because all mining property in the county was reassessed, but other property was not because of an alleged lack of time and inadequate information. The Supreme Court held that this procedure did not violate equal protection.

*Sunday Lake* has been relied upon in a number of cases in other jurisdictions, all of which have held that cyclical revaluation plans do not offend equal protection or uniform taxation.[11]

The four years revaluation plan in the statute does not offend the equal protection provisions in either the Wis-

---

[11] Annot. (1961), 12 A.L.R.2d 1077 and cases cited therein.

consin or United States Constitutions. There is a rational basis, related to the objective of the statute, for treating all manufacturing property differently than other types of property. As the discussion of excess operating costs, above, adequately demonstrates, the valuation of industrial property poses singular problems and requires specialized skills. The legislature did not deny the petitioner equal protection of the law by providing for a unique and specialized means of valuing manufacturing property.[12]

*By the Court.*—Reversed and remanded with instructions to return the case to the Lake District Board of Review for purposes of setting aside the assessment and entering another assessment not inconsistent with this opinion.[13]

---

[12] The petitioner also argues that sec. 70.995, Stats. offends equal protection because there is no provision in the statute for determining which properties will be reassessed in any given year. If there was some showing that the petitioner's property had been revalued a second time prior to other manufacturing properties being revalued the first time, this argument might have some merit. However, on the record now before us, there is no showing that the order in which the revaluations occur is arbitrary or purposely designed to discriminate against the petitioner or any other group of manufacturing property owners.

[13] It is not the function of this Court or the trial court to make a new assessment when undertaking a certiorari review of the actions of a board of review. Our only function is to set aside the assessment if it is fixed upon an improper basis. *Central Cheese Co. v. Marshfield*, 13 Wis.2d 524, 534, 109 N.W.2d 75 (1961).